## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

Case No: 6:20-cv-1240-Orl-WWB-EJK

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, and STATE
FARM FIRE AND CASUALTY COMPANY,

           Plaintiffs,

vs.

COMPLETE CARE CENTERS, LLC,
F/K/A INTEGRATIVE PHYSICAL
MEDICINE HOLDING, LLC,
MARC G. OTT, and BRET G. SCHEUPLEIN,

           Defendants.

_____/

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "Plaintiffs") move for partial summary judgment on Counts I-IV, which are their claims premised on Defendants' violations of Florida's Patient Self-Referral Act of 1992 (Florida Statutes § 456.053) ("PSRA"), and state:

## I.      INTRODUCTION

The PSRA was expressly enacted "to protect the people of Florida from unnecessary and costly health care expenditures." Fla. Stat. § 456.053(2). The Legislature determined that if left unregulated, conflicts of interest in patient referrals would result in overutilization of health care services, increase costs, adversely affect the quality of health care, and limit competitive alternatives. *Id.* Defendants' referral scheme is precisely the type of conduct the Florida Legislature sought to prohibit.

Defendants made thousands of referrals in violation of the PSRA during the

relevant time period here—January 2016 to December 15, 2019. The scheme was orchestrated by two chiropractors—Defendants Marc Ott ("Ott") and Bret Scheuplein ("Scheuplein")—through a group a clinics—Integrative Physical Medicine ("IPM"), Central Florida Imaging ("CFI"), and Interventional Associates ("IA")—which they owned through a holding company—Defendant Complete Care Centers, LLC f/k/a Integrative Physical Medicine Holding, LLC ("Complete Care").[1] The scheme worked as follows:

- **Step 1:** Patients commenced treatment with IPM, a provider of chiropractic and rehabilitative care, following an automobile accident.

- **Step 2:** Ott and Scheuplein caused IPM's employees to order one or more MRIs for patients at their initial exams and to refer them to CFI for the MRIs.

- **Step 3:** After the MRIs, patients returned to IPM where an employee purportedly reviewed their MRI results. At the end of the visit, Ott and Scheuplein caused their employees to refer the patients to IA for an exam performed by a medical specialist, which was scheduled six to eight weeks in advance. In the interim, the patient continued chiropractic and rehabilitative care with IPM.

The PSRA prohibits a "health care provider" from "referring" a patient to an entity in which the "health care provider" is an "investor" or has an "investment interest." Fla. Stat. § 456.053(5)(a)-(b). Plaintiffs are entitled to summary judgment because the undisputed facts show Defendants' self-referrals squarely fit within this prohibition:

- Ott and Scheuplein are chiropractors licensed under Chapter 460 and thus, are "health care providers" under the PSRA.  Fla. Stat. § 456.053(3)(i); [Doc. 1, ¶¶ 18-19]; [Doc. 154, ¶¶ 18-19].

- Ott and Scheuplein are "investors" in CFI and IA because they own an "investment interest" in Complete Care. *See infra* at 4; Fla. Stat. § 456.053(3)(i).

- Scheuplein and IPM's health care providers referred patients to CFI and IA for health care services. *See infra* at 5-6. Under the PSRA, a referral can be made by the "establishment of a plan of care" or by the "forwarding of a patient … to an entity which provides or supplies designated health services or any other health

---

[1] IPM, CFI, and IA are collectively referred to as the "Complete Care Entities." The IPM, CFI, and IA clinic entities are individually identified in Plaintiffs' Complaint. [Doc. 1, ¶ 2]; *see also* Org. Chart, [Doc. 314-3].

care item or service." Fla. Stat. § 456.053(3)(p)(1)-(2). Here, Scheuplein and IPM's health care providers did both. Scheuplein and IPM's health care providers not only established plans of care by ordering the services that were performed at CFI and IA but also by forwarding the patient to CFI and IA for these services.

- Finally, Ott and Scheuplein's prohibited financial interests were imputed to IPM's employees because they directed and controlled their referrals. *See infra* at 6-15; [Doc. 149, PageId.4215-16]; Fla. Stat. § 456.053(5)(f).

Defendants' only defense to this claim is the group practice exception. *See* [Doc. 154, PageID.4432]. To qualify for the group practice exception, the provider is required to both meet the definition of a "group practice" (Fla. Stat. § 456.053(3)(h)) and satisfy the elements of the exception (Fla. Stat. § 456.053(3)(p)(3)(f)). The evidentiary record is clear Defendants did neither. Indeed, Defendants did not even meet the first requirement—that they be organized as a single legal entity. Fla. Stat. § 456.053(3)(h).

For these reasons, and as discussed in more detail below, Plaintiffs are entitled to summary judgment on Counts I-IV as a result of Defendants' violations of the PSRA.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    Ott and Scheuplein Owned and Controlled Complete Care

There is no genuine dispute regarding the corporate structure of Complete Care. Complete Care, a Florida limited liability company ("LLC"), was formed on August 30, 2012. [Doc. 1, ¶ 20]; [Doc. 154, ¶ 20]. Prior to the December 15, 2019 merger, Complete Care was the holding company for seventeen IPM clinic entities, three CFI clinic entities, and three IA clinic entities. Oct. 19, 2021 Deposition of Ott ("Ott Dep."), [Doc. 314-1, 45:12-17]; Org. Chart, [Doc. 314-3]. Defendants operated as "one fully integrated health care system," where patients began treatment with IPM for chiropractic and rehabilitative services, and then were referred to CFI for MRIs and IA for interventional pain management and/or orthopedic services. Marketing Flyer, [Doc. 314-12].

3

There also is no genuine dispute that Ott and Scheuplein own and control Complete Care and its subsidiaries IPM, CFI, and IA. Ott and Scheuplein, who are chiropractors licensed under Chapter 460, each hold a 50% membership interest in Complete Care, and there have never been any other members. [Doc. 1, ¶ 20]; [Doc. 154, ¶ 20]; Ott Dep., [Doc. 314-1, 45:19-46:10]; [Doc. 314-2]; [Doc. 315-2]. No one other than Ott and Scheuplein have ever exercised any control over the Complete Care Entities. Ott Dep., [Doc. 314-1, 46:11-14]. Moreover, IPM operated without a health care clinic license under the "wholly owned" exemption in Florida Statutes § 400.9905(4)(g). *Id*. at 48:2-5; 49:13-22. Under this exemption, Ott and Scheuplein were required to, and in fact did, supervise the business activities of IPM and ensured its compliance with state and federal law. *Id*. at 50:10-25; Dec. 7, 2021 Deposition of Scheuplein ("Scheuplein Dep."), [Doc. 315-1, 63:14-20; 64:5-12].

It is undisputed that the following individuals served as officers of Complete Care:

- Ott served as CEO from 2012 through 2021 and was responsible for developing and implementing the strategies and direction of Complete Care. **Ex. 1** at 9 (Complete Care's Second Supplemental Interrogatory Responses). Ott was paid more than $9.9 million in the form of salaries and distributions made to his management company Insight Management Group, LLC. from 2016 through 2019. *Id*.; **Ex. 2** at 9-11 (Complete Care's Third Supplemental Interrogatory Responses); Management Agreement, [Doc. 314-4, ¶ 3].

- Scheuplein served as Chief Medical Officer ("CMO") from 2012 through 2021 and was responsible for long term strategic planning for clinical care, ensuring all health care regulations were met, and supervision of Complete Care's medical staff. **Ex. 1** at 9-10 Scheuplein was paid more than $9.8 million in the form of salaries and distributions made to his management company Colten Management, LLC from 2016 through 2019. *Id*.; **Ex. 2** at 6-8; Management Agreement, [Doc. 315-3, ¶ 3].

- Alex Petit ("Petit") was promoted to CFO in 2017 and oversaw accounting and operational analytics. **Ex. 1** at 10. Petit reported directly to Ott and Scheuplein. Dec. 9, 2021 Deposition of Alex Petit ("Petit Dep."), [Doc. 317-1, 29:17-18]. Prior to this role, Petit served as the Director of Billing and Operations. *Id*. at 27:7-21.

- Shelby Reid ("Reid") was promoted to COO in 2016 and oversaw the practice

4

managers for all Complete Care clinic locations. **Ex. 1** at 10. Reid reported directly to Ott. Nov. 16, 2021 Deposition of Shelby Reid ("Reid Dep."), [Doc. 321-1, 46:18-20]. Prior to this role, Reid served in a hybrid operations/case manager role and was responsible for staffing and opening new clinic locations. *Id*. at 42:21-43:15.

- Adam Boylan ("Boylan") served as clinic director and was subsequently promoted to CMO in 2021. Nov. 8, 2021 Deposition of Boylan ("Boylan Dep"), [Doc. 320-1, 38:5-16]. As clinic director, he performed audits, office visits and inspections, and would "pass along [his] findings and [his] feedback." *Id*. at 176:23-177:11.

**B.     Scheuplein and IPM's Employees Referred Patients to CFI and IA**

There is no genuine dispute that Scheuplein and IPM's health care providers "referred" patients to CFI and IA. Under the PSRA, a referral can be made by the "establishment of a plan of care" or by the "forwarding of a patient … to an entity which provides or supplies designated health services or any other health care item or service." Fla. Stat. § 456.053(3)(p)(1)-(2). Here, Defendants did both. Scheuplein and IPM's health care providers not only established plans of care by ordering the services performed at CFI and IA but also by forwarding patients to CFI and IA for these services.

In total, from January 2016 through December 15, 2019, Scheuplein and IPM's health care providers referred 1,219 patients to CFI and 1,047 patients to IA. [Doc. 1-2]; [Doc. 1-3]. Complete Care's corporate representative did not dispute the accuracy of the information contained in Exhibits 1-2 to the Complaint. Dec. 14, 2021 30(b)(6) Deposition of Alexandra Petit ("Petit CR Dep."), [Doc. 316-1, 60:22-61:3; 64:12-25].

These referrals are also reflected in the patient records that Complete Care produced in discovery for the at-issue patients.[2] **Ex. 3** at Request No. 7 (Complete Care's 2nd Amended Response to Plaintiffs' 2nd Requests for Production). These records include referral forms for patients referred to CFI for MRIs ("CFI Referral Form") and to IA

---

[2] Complete Care failed to produce records for a subset of 217 patients despite being under multiple Court Orders to do so. *See* [Docs. 139, 179, 285, 323].

for specialty services ("IA Referral Form"). These Referral Forms contain fields identifying the ordered service and the IPM clinic and health care provider who made the referral. As these documents are voluminous, exemplars of the CFI Referral Forms and IA Referral Forms are attached as **Exhibits 4 and 5.** Moreover, exemplars of referrals made by Scheuplein are attached as **Exhibit 6**.

Further, Complete Care maintained spreadsheets that tracked CFI's referral sources ("Referral Trackers"), which were produced in discovery. Because they are voluminous, Plaintiffs attach as an example **Exhibit 7**, an excerpt of a Referral Tracker, which reflects all MRIs performed at CFI from November 1, 2018 through December 13, 2019. Significantly, a health care provider employed by IPM or IA ordered 8,240 of the 8,463 MRIs performed at CFI during this period (**97%**).[3] *See id.*

## C.   Ott and Scheuplein Directed and Controlled IPM's Referrals

There is no genuine dispute Ott and Scheuplein directed and controlled IPM's referrals. Ott conceded Complete Care's policy was to refer patients to CFI for MRIs and stated this "is actually what you would expect in a group practice." Ott Dep., [Doc. 314-1, 195:21-196:10]. The evidentiary record is clear Ott and Scheuplein formed CFI and IA for a singular purpose—so IPM's MRI and specialist orders could be filled in-house and not by a third-party provider. But Ott and Scheuplein developed this new business model, which generated substantial profits for Ott and Scheuplein, without regard to the PSRA or the inherent conflicts of interests associated with this business model.

Before the formation of CFI and IA, IPM referred patients who needed an MRI or

---

[3] The "Initials" Column of **Exhibit 7** reflects the patients' initials, the "Ordering Physician" column reflects the name of the health care provider who ordered the MRI, and the "Referral – Account" column reflects the name of the clinic that referred the patient to CFI.

treatment beyond chiropractic care to other facilities. *See* **Ex. 8** at 8 (New Patient Coordinator Manual). Patients purportedly received "poor service" at these outside imaging centers and orthopedic clinics. *Id*. According to Ott and Scheuplein, because the care at the outside clinics to which they were referring patients was so poor, they had the "brilliant idea" to open CFI and IA. *Id.*; *see also* Ott Dep., [Doc. 314-1, 112:7-113:2; 139:10-19]. According to Amy Connett, Complete Care's Corporate Training Manager, "[t]he reason CFI and IA was founded was due [sic] the fact that competitors offering similar services could not meet the high level of expectation our physicians and staff as Complete Care have for our patients." [Doc. 322-7, 2]. Ms. Connett concluded "our Clinicians would be doing our patient [sic] a disservice be [sic] recommending an external facility."' *Id*. According to the Defendants, the marketplace was in such need of another diagnostic and pain management facility that the Defendants felt required to open their own – wholly owned and controlled – locations to which patients could be referred. *See* Ott Dep., [Doc. 314-1, 112:13-17; 137:16-20].

Ott and Scheuplein marketed IPM, CFI, and IA under the Complete Care umbrella and held them out as a "comprehensive group practice for the injured." *See* [Doc. 314-12]; Ott Dep., [Doc. 314-1, 171:6-14]. As depicted in the flow chart in their marketing materials, Ott and Scheuplein designed a business model where patients started treatment with IPM and then were referred to CFI and IA. *See* [Doc. 314-12]; Ott Dep., [Doc. 314-1, 171:5-22; 172:7-11; 173:14-174:15]. Complete Care's marketing materials portrayed Complete Care as "comprehensive" and as offering patients the ability to remain "under one umbrella" and receive "treatment from start to finish." Marketing Brochure, [Doc. 314-11, PageID.11184]. Complete Care's goal was to become "the

national platform for treating the injured in a fully integrated health system[.]" *Id.*

CFI premised its business model almost entirely on internal referrals from IPM and IA. CFI did not accept more than 15% of its patients from outside referrals (*i.e.*, sources other than IPM or IA), and in practice fewer than 5% of CFI's patients actually came from outside referrals. Ott Dep., [Doc. 314-1, 209:6-25]; Petit CR Dep., [Doc. 316-1, 213:17-215:15]. Ott conceded CFI could not survive financially if CFI had to solely rely on outside referrals. Ott Dep., [Doc. 314-1, 209:6-17]. When CFI's schedule was light, upper management pressured IPM's employees to refer more patients. *See*, *e.g.*, **Exs. 9-11**. Moreover, when CFI opened its third location in Leesburg, Florida, Reid told Ott that CFI "should be able to capture 40+ MRIs right away from surrounding IPMs that are currently sending to other centers." [Doc. 314-14].

Ott directed employee training to ensure IPM "high[ly] recommend[ed]" CFI to its patients. **Ex. 12.** Further, IPM's Front Desk Manager instructed employees that "MRI's will be ordered the day of their New Patient Exam." [Doc. 314-20]. She also provided instructions for scheduling patients with CFI. *Id*. She closed her email by stating "[a]gain NOBODY WALKS OUT ON DAY 1 WITHOUT SCHEDULING." *Id*. Consistent with this email, patients are to be "[r]eferred for MRIs at CFI" on day 1 according to IPM's treatment protocol. [Doc. 314-25]; *see also* [Doc. 322-3].

Ott and Scheuplein also developed procedures for generating referrals to IA. These procedures instructed the health care providers who worked for IPM to refer patients to IA on the same day they "review the MRI with the patient" for an appointment in six to eight weeks. [Doc. 314-19]. Consistent with this, IPM's treatment protocols provide "[p]atient has specialist appointment at IA" around week seven. [Doc. 314-25,

DFS RESP0038745]. Notably, this protocol did not suggest the patient should have an appointment at any specialist—but rather required the patient to be scheduled at IA—the specialist entity owned by Ott and Scheuplein. In January 2018, IPM revised the IA referral process. [Doc. 321-3]. According to Reid, the new focus of the MRI review appointment was not to inform the patient of their imaging findings—which is the standard in a legitimate clinical setting—but rather to schedule the patient for an appointment with IA. *Id*. Further, Reid stated that treatment is "secondary" on the day of the MRI review appointment, which underscores the pressure Defendants exerted on their employees to generate referrals to IA. *Id*.

## 1.    IPM trained its employees to refer patients to CFI and IA

According to Ott, IPM utilized scripts to ensure employees understood how to communicate clearly to patients. Ott Dep., [Doc. 314-1, 170:8-13]. Significantly, Defendants developed MRI and specialist referral scripts, which not only ensured IPM's employees referred patients to CFI and IA but also did so persuasively so the patients accepted the referral. The original MRI script provides in part: "[w]e are sending you to CFI; they are our sister facility and we are able to schedule you there immediately." [Doc. 314-13, DFS RESP 0034212] (emphasis added); [Doc. 315-9, DFS RESP 0030079]; [Doc. 321-2]. Defendants developed a similar script for referrals to IA. [Doc. 321-2].

In August 2018, IPM revised the MRI and specialist referral scripts. *See* [Doc. 322-5]; **Ex. 13** at 220; *see also* **Ex. 14**. The new scripts instructed IPM employees to recommend CFI and IA to patients and to provide a favorable opinion of those entities. *See id*.  The fact the script was revised does not negate the unlawful behavior—if the patients were referred (*i.e.*, a plan of care was established or the patient was forwarded to CFI and IA), then the PSRA was violated. *See* Fla. Stat. § 456.053(3)(p)(1)-(2).

The revised referral scripts also instructed IPM's employees to show patients a "laminated list," which contained MRI and specialist referral options. *See* [Doc. 322-5]; **Ex. 13** at 220. Significantly, the first three provider options for MRIs was CFI, and the first two provider options for specialists were IA. *See* **Ex. 15-16** (Laminated Lists). In practice, Defendants did not allow patients an opportunity to review the laminated lists. After Boylan observed an employee "placing the laminated copy of the MRI centers on the counter in front of the patient when she was delivering her ROF/MRI scheduling scripts," Boylan sent an email to Austin Moffett, the Administrative Health Regional Lead who supervised front desk employees,[4] to ensure patients were still directed to the self-interested entities of CFI and IA. [Doc. 320-2]. In the email, Boylan stated: "[I] thought it was more of a brief referencing or gesturing to the sheet?" *Id*. Ms. Moffett responded: "[y]ou are correct, AHC's should only be using the laminated MRI referral sheet as a quick reference[.]" *Id*. Boylan was also concerned the employee he observed "threw in an additional question where she asked the patient 'Do you want to go somewhere else?'" Ms. Moffett responded: **"[w]e should never be asking if they prefer to go to a different facility. I will touch base with her in regards to this."** *Id*. (emphasis added).

It is undisputed IPM trained its employees to ensure they learned the referral scripts. See, *e.g.*, [315-10, ¶ 2]. Employees were required to handwrite the scripts in Training Workbooks. *See*, *e.g.*, [316-5] at DFS RESP 0026593, 26597; [Doc. 322-6]. IPM also performed quarterly reviews and conducted role play to ensure its employees learned the scripts. [Doc. 322-2]; **Ex. 17**; *see also* **Ex. 18** (AHC Monthly Meeting Notes addressing "Rebuttals and Script [P]ractice"). IPM's PI Boot Camp training materials also

---

[4] Front desk employees are referred to as Administrative Health Coordinators, or AHCs.

included a training video on the MRI referral script. **Ex. 19.**

IPM also provided its employees with prepared responses to frequently asked questions, which were designed to induce referrals to CFI and IA. Question 7 asks: "[w]ho do you refer to for MRI?" [Doc. 314-15]. The prepared response was "**We do our own MRI**." *Id*. (emphasis added). IPM also armed employees with four scripted "CFI Rebuttals," to convince skeptical patients to follow through with the referral to CFI. **Ex. 20**. IPM also provided the same for IA. [Doc. 315-8, at DFS RESP 0114940]. Finally, the Front Desk – Questions and Rebuttals includes the question: "IA is very far away, why do I need to go there?" **Ex. 21**. The prepared response was: "[IA] is our pain management facility for patients who need extra care for relief. Our Physicians there are amazing and they will take great care of you! We are also able to get patients in way quicker than if we were to refer out to other facilities." *Id*.

### 2.   IPM paid bonuses to incentivize referrals to CFI and IA

The Complete Care Entities instituted employee bonus plans, which were reviewed and approved by Ott and Scheuplein, and designed to reward unlawful self-referrals to CFI and IA. Ott Dep., [Doc. 314-1, 296:15-23]. The factors considered in determining the amount of the bonus directly incentivized referrals to CFI and IA. Specifically, Defendants expected 90% of IPM's orders for MRIs and specialists consultations to be completed at CFI and IA. Path to Stats, [Doc. 314-27, at DFS RESP 0038675-76]. The referral bonuses paid by IPM are listed in spreadsheets produced by Defendants under the categories "PIP Patient Follow Through with Doctors Recommended Imaging Special Diagnostic" and "PIP Patient Follow through with Doctors Recommended specialist Referral." *See*, *e.g.*, **Ex. 22** (excerpts of IPM bonus spreadsheets).

### 3.   Ott and Scheuplein closely monitored IPM to ensure their employees

**referred patients to CFI and IA.**

Ott and Scheuplein routinely monitored their employees' referrals. *See* Scheuplein Dep., [Doc. 315-1, 115-23-117:4]; *see, e.g.,* [Doc. 314-16]; [Doc. 314-17]; **Exs. 23-28**. When asked about a week when IPM made no outside referrals, Ott responded he thought it was "wonderful." Ott Dep., [Doc. 314-1, 205:13-19]. Similarly, Ott thought it was a good thing that CFI set a record of 669 scans in May 2019—99% of which were referred by IPM or IA—because he "run[s] a business." *Id.* at 186:1-5; [Doc. 314-14]. Conversely, when patients were referred to non-Defendant owned entities, emails with derogatory and expletive language, such as "ass clown" and "fucker," followed. *See, e.g.*, [Doc. 314-21]; [Doc. 315-6]; [Doc. 314-14]; [Doc. 314-22].

When referrals to facilities other than CFI and IA increased, Complete Care's officers took immediate action to reduce them. For example, on November 11, 2019, Reid developed an "action plan" for Scheuplein and Boylan to limit outside referrals [Doc. 320-3 at 5-7]. The action plan was spurred by an increase in outside referrals from 80 in December 2018 to 267 in October 2019. **Ex. 29** at 2. Boylan responded to Reid with the actions he and Scheuplein took to reduce outside referrals from IPM's Waterford, Debary, Downtown Orlando, and Metro West clinic locations. [Doc. 320-3 at 1-2]. Boylan and Scheuplein directed these health care providers to make referrals to CFI a "priority" and provided them with talking to points to use with patients skeptical of referrals to CFI. *Id.*

On November 11, 2019, Petit emailed Ott and Scheuplein, among others, warning "**MRI Referral locations continue to require serious attention**" and "[c]ontinued monitoring of all offices below is necessary to curb this **excessive outside trend**." **Ex. 30** at 3. Larry White, an outside consultant, responded in part: "Why is the trend on imaging trending downward?" *Id.* at 2. Petit responded: "whys on CFI have been beaten

12

to death internally over the past month. Its [sic] a training issue [Scheuplein] has been working on but I was emphasizing the need for it to continue." *Id*. at 1.

On December 2, 2019, Petit emailed Ott and Scheuplein the trend expectations for Complete Care for November and December. **Ex. 31**. Regarding CFI, Petit reported the "referral problem" was "corrected" except for IA's Lakeland and IPM's Oviedo clinic locations, which she asked Scheuplein and Reid to "investigate." *Id*. at 5. The next day, Petit replied, advising Scheuplein and Boylan that the MRI referrals for IPM's Clermont clinic location required "continued attention" and reiterating her concerns regarding IA's Lakeland and IPM's Oviedo clinic locations. *Id*. at 2. Reid responded to Petit with the results of her review of the outside referrals made by IA's Lakeland clinic location. *Id*. at 1. Reid stated "there is no reason not to send to CFI. Dr. Bundy will be addressing the differences in our center vs others on his weekly call." *Id*.

On December 9, 2019, Petit emailed Ott and Scheuplein, among others, and reported they successfully reduced the number of outside referrals. She proclaimed that "MRI referrals are improved!" and "CLERMONT is a big win!" **Ex. 32** at 3. To ensure outside referrals did not increase again in the future, she recommended continued monitoring of IPM's referrals. *Id*. at 4. Boylan responded to the email to identify additional steps he took to reduce outside referrals. *Id*. at 1.

On February 13, 2020, Reid circulated a chart to the Executive Team reflecting only 20 outside referrals in February 2020—down from 267 in October 2019—and stated: "[t]his trend is worth celebrating!" **Ex. 29** at 1-2. Petit responded: "Yes! Thank you for sending that MRI graph. It is a fantastic imaging win!! The overall trend has been completely curbed where we can just nit pick [sic] much smaller issues ☺."

These undisputed facts leave no genuine factual debate that Ott and Scheuplein caused unlawful referrals between their self-interested entities, which violated the PSRA.

**D.      The Complete Care Entities Were Not a Group Practice**

To qualify for the group practice exception, the provider must meet the definition of a "group practice" (Fla. Stat. § 456.053(3)(h)) and satisfy the elements of the exception (Fla. Stat. § 456.053(3)(p)(3)(f)). Defendants did not satisfy either requirement here.

The Complete Care Entities did not meet the definition of a "group practice" for three reasons.  First, the Complete Care Entities were not a single legal entity (Fla. Stat. § 456.053(3)(h)), and second they did not bill in the name of a group (Fla. Stat. § 456.053(3)(h)(2)).  Rather, each Complete Care Entity was organized as a separate LLC and billed through its own unique tax identification number. *See* [Doc. 314-3]; Ott Dep., [Doc. 314-1, 56:14-17; 57:10-22; 60:9-21]; Petit CR Dep., [Doc. 316-1, 208:21-22]. Third, the Complete Care Entities' overhead expenses and income were not distributed in accordance with previously determined methods. *See* Fla. Stat. § 456.053(3)(h)(3); Petit CR Dep., [Doc. 316-1, 206:2-209:12; 212:5-20]; *see also* Scheuplein Dep., [Doc. 315-1, 70:20-71:20].

The Complete Care Entities also failed to satisfy the elements of the group practice exception. The exception is set forth in Florida Statutes § 456.053(3)(p)(3)(f), which defines "referral" as not including an order, recommendation, or plan of care "[b]y a ... member of a group practice for designated health services ... **that are prescribed or provided solely for such. . . group practice's own patients**, and that are provided or performed by or under the **direct supervision** of such ... group practice." (Emphasis added). The Complete Care Entities failed to satisfy this exception because the evidentiary record is clear IA accepted patients who were referred by physicians outside

14

of the purported group—the Complete Care Entities. Ott Dep., [Doc. 314-1, 64:18-21].

Moreover, CFI's services were not performed under direct supervision, which requires the

supervising physician to be physically present in the office suite. *See* Fla. Stat. §

456.053(e) and (o). This is because CFI did not employ or engage any health care

providers who were present in its office suites. Ott Dep., [Doc. 314-1, 133:6-18; 134:13-

135:2; 154:21-155:24]. Indeed, the health care providers who worked for IPM could not

provide direct supervision for CFI because:

- Central Florida Imaging, LLC and Integrative Physical Medicine of Lake Mary, LLC did not share the same office hours. Ott Dep., [Doc. 314-1] 134:25-135:14. Moreover, Central Florida Imaging, LLC and Integrative Physical Medicine of Lake Mary, LLC leased distinct office space with their own building entrances. *See id.* at 130:10-14; [Doc. 314-6]; [Doc. 314-7].

- Central Florida Imaging of Lakeland, LLC operated from an MRI trailer and thus, did not operate from the same office suite as Integrative Physical Medicine of Winter Haven, LLC. Ott Dep., [Doc. 314-1, 131:12-14; 132:5-25]. In November 2016, Central Florida Imaging of Lakeland, LLC moved into the same building as Integrative Physical Medicine of Lakeland, LLC. However, the clinics were located in different suites and executed separate lease agreements for their spaces. *See* [Doc. 314-8]; [Doc. 314-9].

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the

initial burden of stating the basis for its motion and identifying those portions of the record

demonstrating the absence of genuine issues of material fact. *Id.* at 323. "Issues of fact

are 'genuine only if a reasonable jury, considering the evidence present, could find for the

nonmoving party,' and a fact is 'material' if it may affect the outcome of the suit under

governing law." *Yellow Pages Photos, Inc. v. YP, LLC*, 856 F. App'x. 846, 854 (11th Cir.

2021) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)). A party

cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006). When the moving party has discharged its burden, the nonmoving party must then identify specific facts showing there is a genuine issue of material fact. *Celotex*, 477 U.S. at 324.

## IV.   DEFENDANTS' SELF-REFERRALS VIOLATED FLORIDA LAW

## A.   Defendants Violated the PSRA

There is no genuine dispute that Defendants violated the PSRA, which prohibits a "health care provider" from "referring" a patient to an entity in which the "health care provider" is an "investor" or has an "investment interest." Fla. Stat. § 456.053(5)(a)-(b).

Ott and Scheuplein are chiropractors and thus, are "health care providers" under the PSRA. Fla. Stat. § 456.053(3)(i); [Doc. 314-2]; [Doc. 315-2]. Moreover, Ott and Scheuplein own 100% of the members interests in CFI and IA through Complete Care, which constitutes an "investment interest" under the PSRA. Fla. Stat. § 456.053(3)(k); Ott Dep., [Doc. 314-1, 45:19-46:10]. Thus, Ott and Scheuplein are "investors" in CFI and IA. Fla. Stat. § 456.053(3)(l). Consequently, Ott and Scheuplein were prohibited from referring patients to CFI for MRIs, which are "designated health services" (*see* Fla. Stat. § 456.053(3)(c)-(d)), or to IA for "any other health care item or service." Fla. Stat. § 456.053(5)(a)-(b). Despite this prohibition, Scheuplein referred patients to CFI in violation of the PSRA by ordering MRIs for patients (Fla. Stat. § 456.053(3)(p)(2)) and forwarding them to CFI for the same (Fla. Stat. § 456.053(3)(p)(1)). *See*, *e.g.*, **Ex. 6.**

The referrals made by the health care providers who worked for IPM also violated the PSRA. Ott's and Scheuplein's prohibited financial interest was imputed to these individuals because the evidentiary record demonstrates Ott and Scheuplein directed,

controlled, or caused their referrals. The PSRA contains an anti-circumvention provision precluding the referral scheme Ott and Scheuplein orchestrated at IPM. Fla. Stat. § 456.053(5)(f). Indeed, the PSRA expressly prohibits a health care provider—such as Ott and Scheuplein—from entering into a scheme that has a principal purpose of assuring referrals to a particular entity that the health care provider is prohibited from making individually. *Id.* Further, this Court has held the PSRA prohibited Ott and Scheuplein from directing and controlling their employees' referrals:

> To be clear, Defendants are asking this Court to find that Ott cannot be held liable for directing others to do for his benefit that which the law specifically prohibited him from doing himself. Both common sense and decisions by the Florida Department of Health militate against such an outcome.

[Doc. 149, PageId.4216] (citations omitted).

There is no genuine dispute Ott and Scheuplein caused their employees to refer patients to CFI and IA. They monitored their employees' referrals, sent derogatory emails when employees made outside referrals, developed referral scripts for their employees to recite to patients, instituted bonuses to incentivize referrals to CFI and IA, and instructed Complete Care's officers to reduce outside referrals. *See supra* at 6-14.

Moreover, Ott and Scheuplein controlled their employees' referrals as a matter of law because they collectively held 100% of the membership interests in IPM and served as the two highest ranking corporate officers. *See In re Anthony,* No. 8:13-AP-00629-RCT, 2019 WL 10734097, at *10 (Bankr. M.D. Fla. Feb. 28, 2019) (recognizing an employee's actions "are determined and directed by his employer"); *Sells v. CSX Transp., Inc.*, 170 So. 3d 27, 46 (Fla. 1st DCA 2015) (Swanson, J., dissenting) ("In the employer-employee relationship, the employer controls the employee; if the employee wishes to remain employed he must work when and where the employer directs him.");

Restatement (Second) of Agency § 220(1) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control"). Moreover, IPM operated without a health care clinic license pursuant to the "wholly owned" exemption set forth in Florida Statutes § 400.9905(4)(g). Ott Dep., [Doc. 314-1] 48:2-5; 49:13-22. Under this exemption, Ott and Scheuplein were required to, and purportedly did, supervise IPM's business activities and ensured its compliance with state and federal law. *Id*. at 46:11-14; 50:10-25; Scheuplein Dep., [Doc. 315-1, 63:14-20; 64:5-12]; *see also State Farm Mut. Auto. Ins. Co. v. Advantacare of Fla., LLC*, No. 619CV1837ORL41LRH, 2020 WL 2630226, at *12 (M.D. Fla. May 22, 2020). As a result, the scheme which they designed, implemented, and caused to be acted upon results in liability to both their wholly owned entities as well as Ott and Scheuplein personally.

**B.    Defendants Are Not A Group Practice**

Defendants argue Plaintiffs' claims are barred by the group practice exception. [Doc. 154, PageId.4432]. To qualify for the same, the provider must meet the definition of a "group practice" (Fla. Stat. § 456.053(3)(h)) and satisfy the elements of the exception (Fla. Stat. § 456.053(3)(p)(3)(f)). The evidentiary record is clear Defendants did neither.

To meet the group practice definition, several elements must be present. First, the group practice must be a single legal entity. *See* Fla. Stat. § 456.053(3)(h). In evaluating this element, the Florida Board of Medicine has turned to the Commentary to the federal regulations implementing the federal Stark Act, which provides:

> As we have said elsewhere in this preamble, we believe that the statute contemplates a group practice that is composed of one single group of physicians **who are organized into one legal entity**. In short, we do not believe that a group practice can consist of two or more groups of physicians, each organized as separate legal entities.

*In re: Petition for Declaratory Statement of Tallahassee Neurological Clinic, P.A.*, Final Order No. DOH-04-0921-DS-MQA at ¶ 9 (August 16, 2004) (*quoting* 60 Fed. Reg. 41935-36 (Aug. 14, 1995)) (emphasis added). This Commentary also provides a group practice cannot consist of two or more groups of physicians, each organized as a separate legal entity regardless of common ownership:

> We do not view two independent group practices as a single practice, just because they are organizationally interrelated through common ownership or other substantial or ongoing connections. We believe that the statute would have explicitly allowed for a "common ownership" or "substantial connection" configuration as part of the group practice definition had Congress intended to include it.

60 Fed. Reg. 41914-01, 41935 (Aug. 14, 1995).

Here, Defendants indisputably were not organized as a single legal entity. Rather, each IPM, CFI, and IA clinic entity was a separate LLC. [Doc. 314-3]; Ott Dep., [Doc. 314-1, 45:12-17; 56:14-17; 57:10-22; 60:9-15].

Second, to meet the definition of a group practice, the group practice's services must be "billed in the name of the group[.]" *See* Fla. Stat. § 456.053(3)(h)(2). Here, the Complete Care Entities did not bill for their services in the name of a group, but rather each IPM, CFI, and IA clinic entity billed under its own name and unique tax identification number. Ott Dep., [Doc. 314-1, 56:14-17; 57:10-22; 60:9-21]; Petit CR Dep., [Doc. 316-1, 208:21-22].

Third, to meet the definition of a group practice, the overhead expenses of and the income from the practice must be distributed in accordance with methods previously determined by members of the group. *See* Fla. Stat. § 456.053(3)(h)(2). Here, Complete Care's corporate representative admitted the overhead expenses of and income from the Complete Care Entities were not distributed in accordance with methods previously

determined by members of the group. Petit CR Dep., [Doc. 316-1, 206:2-209:12; 212:5-20]; *see also* Scheuplein Dep., [Doc. 315-1, 70:20-71:20]. Moreover, Ott and Scheuplein did not distribute income through their management companies in accordance with methods previously determined by members of the group. Rather, the income was distributed on an *ad hoc* basis each month. Petit CR Dep., [Doc. 316-1, 73:13-19; 75:2-76:14]. Thus, the Complete Care Entities fail to meet the definition of a group practice.

Similarly, the Complete Care Entities failed to satisfy the elements of the group practice exception. The exception is set forth in section 456.053(3)(p)(3)(f), which defines "referral" as not including an order, recommendation, or plan of care "[b]y a ... member of a group practice for designated health services ... **that are prescribed or provided solely for such. . . group practice's own patients**, and that are provided or performed by or under the **direct supervision** of such ... group practice." Fla. Stat. § 456.053(3)(p)(3)(f) (emphasis added). The Complete Care Entities failed to satisfy this exception for two reasons. First, IA accepted patients who were referred by physicians outside of the purported group—the Complete Care Entities. Ott Dep., [Doc. 314-1, 64:18-21]. Thus, the Complete Care Entities' services were not "provided solely" for the purported group. *See Agency for Health Care Admin. v. Wingo*, 697 So. 2d 1231, 1233 (Fla. 1st DCA 1997) (holding clinic forfeited the group practice exemption by accepting outside referrals).[5]

Second, the Complete Care Entities' services were not performed under direction

---

[5] The PSRA was subsequently amended to allow a group practice to accept up to "15 percent of their patients receiving diagnostic imaging services from outside referrals[.]" *See Aarmada Prot. Sys. 2000, Inc. v. Yandell*, 73 So. 3d 893, 899 (Fla. 4th DCA 2011). However, the larger prohibition on outside referrals remains.

supervision, which requires the supervising to be physically present in the office suite. *See* Fla. Stat. § 456.053(e) and (o); *see also In re: Petition for Declaratory Statement of Jacksonville Heart Center, P.A.*, Final Order No. DOH-08-0036-DS-MQA, (Jan. 9, 2008) (finding petitioner did not qualify for the group practice exemption because it conducted sleep studies when a physician was not physically present on premises). This is because CFI did not employ or engage any health care providers who were present in its office suites. Ott Dep., [Doc. 314-1, 133:6-18; 134:13-135:2; 154:21-155:24]. Moreover, the health care providers who worked for IPM could not provide direct supervision for CFI because IPM and CFI maintained different office hours and operated from separate office suites. *See supra* at 15; Ott Dep., [Doc. 314-1, 130:10-14; 131:12-14; 132:5-25; 134:25-135:14]; [Doc. 314-6]; [Doc. 314-7]; [Doc. 314-8]; [Doc. 314-9].

Thus, Defendants are not a group practice and do not qualify for the exception.

## V.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS I–IV

### A.   Unjust Enrichment (Count I)

Plaintiffs are entitled to summary judgment on their unjust enrichment claim based on Defendants' violations of the PSRA. Florida law supports a cause of action for unjust enrichment upon a defendant's acceptance and retention of a benefit "that it is not legally entitled to receive in the first place." *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 584 (11th Cir. 2013). The Eleventh Circuit in *Silver Star* reasoned: "State Farm claimed in this case that Silver Star was unjustly enriched because it accepted payments from State Farm that it was not entitled to under Florida law. **If an entity accepts and retains benefits that it is not legally entitled to receive in the first place, Florida law provides for a claim of unjust enrichment.**" *Id*.

It is undisputed Plaintiffs conferred a benefit on CFI and IA for the services identified in the Complaint, and CFI and IA voluntarily accepted and retained this benefit. It is also undisputed Ott and Scheuplein received the benefit of the unlawful self-referrals between the Complete Care Entities in the form of salaries and payments made to their management companies which total more than $19.7 million. *See* **Ex. 1** at 9-10; **Ex. 2** at 6-11; *see also State Farm Mut. Auto. Ins. Co. v. Physicians Inj. Care Ctr., Inc.*, 427 F. App'x 714, 722–23 (11th Cir. 2011) (holding the fact defendants were sole shareholders of clinic and heavily involved in its operations was "sufficient evidence of a benefit conferred to support unjust enrichment.").

There is no genuine dispute CFI and IA performed the services identified on Exhibits 1-2 to the Complaint pursuant to referrals prohibited by the PSRA and thus, the services are non-compensable.  Because Defendants were not legally entitled to receive the payments identified on Exhibits 7 & 9 to the Complaint, Defendants should be required to disgorge any payments they received from Plaintiffs.

**B.    Violations of the Florida Deceptive and Unfair Trade Practices Act (Count II)**

To prevail on a FDUTPA claim, Plaintiffs must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. [Doc. 149, at 5]. "A deceptive act or practice is 'one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d 1343, 1354 (S.D. Fla. 2015) (citations omitted). Moreover, "'[d]eception may be accomplished by innuendo rather than outright false statements.'" *State Farm Mut. Auto. Ins. Co. v. Health & Wellness Servs., Inc.*, 446 F. Supp. 3d 1032, 1053 (S.D. Fla. 2020) (citations omitted).

Further, "[t]o determine whether an act is deceptive or unfair, Florida law applies an objective test: 'whether the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances, rather than actual reliance on the representation or omission at issue.'" *Id*. Where corporate officers or shareholders directly participate in improper conduct, they can be held individually liable under FDUTPA. *See State Farm Mut. Auto. Ins. Co. v. Muse*, No. 20-13319, 2022 WL 413417, at *5 (11th Cir. Feb. 10, 2022); *Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*, 657 F. Supp. 2d 1279, 1287–88 (M.D. Fla. 2009).

Defendants' conduct was clearly deceptive under FDUTPA.  The submission of unlawful, unenforceable, and non-compensable invoices for payment, to which one is not entitled, is a deceptive practice that violates FDUTPA.  *See Health & Wellness Servs., Inc.*, 446 F. Supp. 3d at 1053; *State Farm Mut. Auto. Ins. Co. v. First Care Sol., Inc.*, 232 F. Supp. 3d 1257, 1268–69 (S.D. Fla. 2017); *Med. Serv. Ctr. of Fla., Inc.*, 103 F. Supp. 3d at 1354-55; *Williams v. Delray Auto Mall, Inc.*, 916 F. Supp. 2d 1294, 1300 (S.D. Fla. 2013); *see also* Fla. Stat. § 456.053(5)(c).

There is no issue of material fact CFI and IA submitted claims for payment to Plaintiffs for services furnished pursuant to referral prohibited by the PSRA. Moreover, Ott and Scheuplein were directly in control of the operations of the Complete Care Entities as owners and officers. *See supra* at 3-5. Thus, Defendants collectively engaged in a deceptive practice that violated FDUTPA.  Plaintiffs issued payment as a result of the deceptive practices. *See* **Ex. 33**, Declaration of Stephen Bright ("Bright Dec."), ¶¶ 7-11. Accordingly, Defendants are jointly and severally liable for Plaintiffs' FDUTPA claim.

**C.      PSRA (Count III)**

Under the PSRA, an entity that collects any amount billed in violation of the PSRA is required to refund the amount collected to the payor "on a timely basis[.]" Fla. Stat. § 456.053(5)(d). When a provider fails to make these required refunds, payors such as Plaintiffs have the right to sue to recover payments that should have been refunded under section (5)(d) of the PSRA. *See State Farm Mut. Auto. Ins. Co. v. Physicians Group of Sarasota, L.L.C.*, 9 F. Supp. 3d 1303, 1313 (M.D. Fla. 2014) (finding "Section 456.053(5)(d) clearly establishes a payor's right to a refund.").

There is no dispute Defendants, through CFI and IA, collected amounts billed in violation of the PSRA. *See supra* at 5-12 (detailing undisputed evidence showing violation of PSRA by Defendant Complete Care).  It is also undisputed Defendants made no refunds to Plaintiffs; the amounts paid remain outstanding. Bright Dec., ¶ 11.  Thus, Plaintiffs are entitled to summary judgment directing Defendant to refund the amounts collected from Plaintiffs for charges billed in violation of the PSRA.

## D.    Declaratory Relief (Count IV)

Plaintiffs are entitled to a declaration they are not required to pay any outstanding claims that were presented by CFI or IA for services furnished pursuant to a referral from IPM or IA. These referrals were unlawful when made, and CFI and IA were prohibited from submitting these claims for payment to Plaintiffs. *See* Fla. Stat. § 456.053(5)(a)-(c); *see also* Fla. Stat. § 627.736(5)(b)(1)(c) ("An insurer or insured is not required to pay a claim or charges … [f]or any service or treatment that was not lawful at the time rendered."). "The law in this circuit is well settled that insurers like State Farm are not obligated to pay bills submitted by a clinic that is operating unlawfully." *Health & Wellness Servs., Inc.*, 446 F. Supp. 3d at 1057 (collecting cases). Thus, Plaintiffs are entitled to a declaration that they do not owe CFI's and IA's outstanding claims for payment.

## VI.     DAMAGES

There is no dispute of material fact concerning Plaintiffs' damages. Between January 1, 2016 and December 14, 2019, Plaintiffs suffered $2,516,173.41 in damages for payments made to Complete Care, CFI, and/or IA for services billed in violation of the PSRA. Bright Dec., ¶¶ 7-11; Compl., Ex. 7 [Doc. 1-8] at 30; Compl., Ex. 9 [Doc. 1-10] at 23. In discovery, Plaintiffs produced copies of each payment draft issued to CFI and IA. Bright Dec., ¶¶ 12-13. These records would be too voluminous to file in support of Plaintiffs' Motion; however, summary charts providing a claim by claim breakdown of Plaintiffs' payments for Complete Care's unlawful self-referrals are attached to the Complaint as Exhibits 7 [Doc. 1-8] and 9 [Doc. 1-10]. *See* Fed. R. Evid. 1006.

## VII.     CONCLUSION

For these reasons, Plaintiffs are entitled to summary judgment on Counts I-IV.

Dated: March 2, 2022

Respectfully submitted,

By: */s/ David I. Spector*
David I. Spector (Fla. Bar No. 086540)
James J. Duffy (Fla. Bar No. 0068662)
**HOLLAND & KNIGHT LLP**
777 South Flagler Drive, Suite 1900
West Palm Beach, Florida  33401
Telephone:  (561) 833-2000
david.spector@hklaw.com
james.duffy@hklaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, causing a copy of the foregoing document to be served on all counsel of record via Notice of Electronic Filing.

*/s/ David I. Spector*
DAVID I. SPECTOR